**FOR PUBLICATION**

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

| | |
|---|---|
| TYLER CHASE HARPER, a minor, by and through his parents Ron and Cheryl Harper; RON HARPER; CHERYL HARPER, <br><br> Plaintiffs - Appellants, <br><br> v. <br><br> POWAY UNIFIED SCHOOL DISTRICT; JEFF MANGUM; LINDA VANDERVEEN; PENNY RANFTYLE; STEVE MCMILLAN; ANDY PATAPOW, All Individually and in their official capacity as Members of the Board of the Poway Unified School District; DONALD A. PHILLIPS, Individually, and in his official capacity as Superintendent of the Poway Unified School Disrict; SCOTT FISHER, Individually and in his official capacity as Principal of Poway High School; LYNELL ANTRIM, Individually and in her official capacity as Assistant Principal of Poway High School; ED GILES, Individually and in his official capacity as Vice Principal of Poway High School; DAVID LEMASTER, Individually and in his official capacity as Teacher of Poway High School; DOES 1 THROUGH 20, INCLUSIVE, <br><br> Defendants - Appellees. | No. 04-57037 <br><br> D.C. No. CV-04-01103-JAH <br><br> OPINION |

Appeal from the United States District Court
for the Southern District of California
John A. Houston, District Judge, Presiding

Argued and Submitted June 6, 2005
Pasadena, California

Filed April 20, 2006

Before: REINHARDT, KOZINSKI, and THOMAS, Circuit Judges.

REINHARDT, Circuit Judge:

May a public high school prohibit students from wearing T-shirts with messages that condemn and denigrate other students on the basis of their sexual orientation? Appellant in this action is a sophomore at Poway High School who was ordered not to wear a T-shirt to school that read, "BE ASHAMED, OUR SCHOOL EMBRACED WHAT GOD HAS CONDEMNED" handwritten on the front, and "HOMOSEXUALITY IS SHAMEFUL" handwritten on the back. He appeals the district court's order denying his motion for a preliminary injunction. Because he is not likely to succeed on the merits, we affirm the district court's order.

2

# I.  Factual Background[1]

Poway High School ("the School") has had a history of conflict among its students over issues of sexual orientation.  In 2003, the School permitted a student group called the Gay-Straight Alliance to hold a "Day of Silence" at the School which, in the words of an Assistant Principal, is intended to "teach tolerance of others, particularly those of a different sexual orientation."[2]  During the days surrounding the 2003 "Day of Silence,"[3] a series of incidents and altercations occurred on the school campus as a result of anti-homosexual comments that were made by students.  One such confrontation required the Principal to separate students physically.  According to David LeMaster, a teacher at Poway, several students were suspended as a result of these conflicts.  Moreover, a week or so after the "Day of Silence," a group of heterosexual students informally organized a

[1]These background facts are based on the limited record before us which includes five declarations by school officials, and declarations from Harper, his father, Ron Harper, and a fellow student, Joel Rhine.

[2]In his complaint, Harper alleges that he believes "the true purpose" of the "Day of Silence" was "to endorse, promote and encourage homosexual activity."

[3]On the "Day of Silence," participating students wore duct tape over their mouths to symbolize the silencing effect of intolerance upon gays and lesbians; these students would not speak in class except through a designated representative. Some students wore black T-shirts that said "National Day of Silence" and contained a purple square with a yellow equal sign in the middle.  The Gay-Straight Alliance, with the permission of the School, also put up several posters promoting awareness of harassment on the basis of sexual orientation.

"Straight-Pride Day," during which they wore T-shirts which displayed derogatory remarks about homosexuals. According to Assistant Principal Lynell Antrim, some students were asked to remove the shirts and did so, while others "had an altercation and were suspended for their actions."

Because of these conflicts in 2003, when the Gay-Straight Alliance sought to hold another "Day of Silence" in 2004, the School required the organization to consult with the Principal to "problem solve" and find ways to reduce tensions and potential altercations. On April 21, 2004, the date of the 2004 "Day of Silence," appellant Tyler Chase Harper wore a T-shirt to school on which "I WILL NOT ACCEPT WHAT GOD HAS CONDEMNED," was handwritten on the front and "HOMOSEXUALITY IS SHAMEFUL 'Romans 1:27'" was handwritten on the back. There is no evidence in the record that any school staff saw Harper's T-shirt on that day.

The next day, April 22, 2004, Harper wore the same T-shirt to school, except that the front of the shirt read "BE ASHAMED, OUR SCHOOL EMBRACED WHAT GOD HAS CONDEMNED," while the back retained the same message as before, "HOMOSEXUALITY IS SHAMEFUL 'Romans 1:27.'"[4] LeMaster, Harper's second period teacher, noticed Harper's shirt and observed "several

_____

[4]A copy of a photograph of the T-shirt is attached as Exhibit A.

4

students off-task talking about" the shirt. LeMaster, recalling the altercations that erupted as a result of "anti-homosexual speech" during the previous year's "Day of Silence," explained to Harper that he believed that the shirt was "inflammatory," that it violated the School's dress code, and that it "created a negative and hostile working environment for others." When Harper refused to remove his shirt and asked to speak to an administrator, LeMaster gave him a dress code violation card to take to the front office.

When Harper arrived at the front office, he met Assistant Principal Antrim. She told Harper that the "Day of Silence" was "not about the school promoting homosexuality but rather it was a student activity trying to raise other students' awareness regarding tolerance in their judgement [sic] of others." Antrim believed that Harper's shirt "was inflammatory under the circumstances and could cause disruption in the educational setting." Like LeMaster, she also recalled the altercations that had arisen as a result of anti-homosexual speech one year prior. According to her affidavit, she "discussed [with Harper] ways that he and students of his faith could bring a positive light onto this issue without the condemnation that he displayed on his shirt." Harper was informed that if he removed the shirt he could return to class.

When Harper again refused to remove his shirt, the Principal, Scott Fisher, spoke with him, explaining his concern that the shirt was "inflammatory" and that it was the School's "intent to avoid physical conflict on campus." Fisher also explained to Harper that it was not healthy for students to be addressed in such a derogatory manner. According to Fisher, Harper informed him that he had already been "confronted by a group of students on campus" and was "involved in a tense verbal conversation" earlier that morning.[5] The Principal eventually decided that Harper could not wear his shirt on campus, a decision that, he asserts, was influenced by "the fact that during the previous year, there was tension on campus surrounding the Day of Silence between certain gay and straight students."[6] Fisher proposed some alternatives to wearing the shirt, all of which Harper turned down. Harper asked two times to be suspended. Fisher "told him that [he] did not want

_____

[5]In his affidavit, Harper characterized these conversations with other students as "peaceful discussions wherein differing viewpoints were communicated."

[6]We note that conflicts over homosexuality at Poway High School have not been limited to the incidents surrounding a "Day of Silence." Two former students recently won a suit against the School for failing to protect them from students who harassed them because they are gay. *See* Dana Littlefield, *Two Gay Students Were Harassed, Jury Finds*, San Diego Union-Trib., June 9, 2005, at B2. During the trial, one of the students testified that Poway "students repeatedly called him names, shoved him in the hallways, threw food at him and spit on him," and "that he heard other students make disparaging remarks about gays and lesbians on a nearly daily basis." *Id*.

6

him suspended from school, nor did [he] want him to have something in his disciplinary record because of a stance he felt strongly about." Instead, Fisher told Harper that he would be required to remain in the front office for the remainder of the school day.

Harper spent the rest of the day in the school conference room doing his homework. At some point during that day, Deputy Sheriff Norman Hubbert, who served as the school resource officer for Poway High, came in to speak with Harper.[7] The complaint alleges that Hubbert "came to interrogate" Harper to "determine if he was a dangerous student." Hubbert, however, asserts in his affidavit that he and Harper had a "casual conversation concerning the content of the shirt . . . the Bible and [the] scripture reference on the shirt," and that the conversation was conducted "simpl[y out of] curiosity . . . to understand the situation."

Toward the end of the school day, Assistant Principal Ed Giles spoke with Harper. Giles had discovered earlier in the day that Harper attended the same

_____

[7]Hubbert, who is a detective with the San Diego County Sheriff, was on campus that day because someone, purporting to be a parent, had called the School that morning complaining about the School's "condoning" the "Day of Silence" and stated that "he and several other parents had 'had it' and 'would be doing something about it.'" Concerned about safety, Principal Fisher had requested Hubbert's presence on campus on that day.

church that he had previously attended, and that he "knew [Harper's] father personally and had attended Biblical studies that [Harper's] father led on Tuesday nights." According to Giles, he went to speak with Harper "out of respect to [Harper] and his family" and "to make sure he was alright." Giles told Harper that he understood "where he was coming from" but wished that he could "express himself in a more positive way." Giles also said that he shared the same Christian faith as Harper, but that as a school employee, he had to watch how he expressed his beliefs and that when he came to work, he had to "leave his faith in [the] car." Giles then asked Harper to "consider other alternatives that would be more positive and non-confrontational," including sponsoring activities through the campus Bible Club.

After his conversation with Giles, Harper remained in the office for the last period of the day, after which he was instructed to proceed directly off campus. Harper was not suspended, no disciplinary record was placed in his file, and he received full attendance credit for the day.

## II. Procedural History

On June 2, 2004, Harper filed a lawsuit in district court against Poway Unified School District and certain named individuals in their individual and official capacities. Harper alleged five federal causes of action – violations of his

8

right to free speech, his right to free exercise of religion, the Establishment Clause, the Equal Protection Clause, and the Due Process Clause – and one state law claim based on California Civil Code § 52.1, which creates a private cause of action for the violation of individual federal and state constitutional rights. On June 22, 2004, the School filed a motion to dismiss, and on July 12, 2004, Harper filed a motion for a preliminary injunction seeking to enjoin the school from "continuing [its] violation of the constitutional rights of Plaintiff Tyler Chase Harper." On November 4, 2004, the district court granted the School's motion to dismiss as to Harper's equal protection, due process,[8] and state law claims, but denied the motion as to his three First Amendment claims: freedom of speech, free exercise of religion, and establishment of religion. The district court also granted the School's motion to dismiss Harper's damages claims against Poway Unified School District and the individual defendants on the ground of qualified immunity. Finally, the district court denied Harper's motion for a preliminary injunction. Harper then filed an interlocutory appeal from the order denying the latter motion.[9]

---

[8]The district court dismissed with prejudice only Harper's due process challenge.

[9]We note that on November 17, 2004, thirteen days after the district court rendered its decision and two days prior to filing his Notice of Appeal with this court, Harper filed a First Amended Verified Complaint adding his sister, Kelsie,

(continued...)

### III. Jurisdiction

We have jurisdiction to review the district court's denial of the preliminary injunction motion under 28 U.S.C. § 1292(a)(1).

### IV. Standard and Scope of Review

For a district court to grant a preliminary injunction, the moving party must demonstrate either "(1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor." *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). "Each of these two formulations requires an examination of both the potential merits of the asserted claims and the harm or hardships faced by the parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 965 (9th Cir. 2002). "These two alternatives represent extremes of a single continuum, rather than two separate tests." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir. 1999) (citation and internal quotation marks omitted). Accordingly, "the greater the relative hardship to the

---

[9](...continued)
who is a freshman at Poway High School, as a plaintiff. On February 23, 2005, the district court granted in part and denied in part the School's motion to dismiss the First Amended Complaint. Because the amended complaint is not before this court on appeal, we limit our review to Harper.

moving party, the less probability of success must be shown." *Id.* (citation and internal quotation marks omitted).

The district court concluded, and the School concedes on appeal, that because Harper's First Amendment claims survived the motion to dismiss, Harper made the necessary showing of irreparable harm. *See Sammartano*, 303 F.3d at 973 (internal quotation marks omitted) ("[A] party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim."). The balance of hardships does not, however, tip in his favor.[10] Therefore, the question is whether Harper demonstrated a likelihood of success on the merits as to any or all of his three First Amendment claims.

We review a district court's grant or denial of a preliminary injunction for abuse of discretion. *A & M Records, Inc.*, 239 F.3d at 1013. We will reverse "only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *El Pollo Loco, Inc. v.*

---

[10]The district court concluded that "balancing the needs of the School to keep all their students safe coupled with the foreseeable vision that other students may feel free to exhibit these types of expressions that would interfere with the work of the school and violate the rights of others against [Harper's] interests does not tip the scales sharply in [Harper's] favor." As our analysis of *Tinker* below illustrates, not only does the balance of hardships not tip sharply in Harper's favor, but it does not tip in his favor at all.

*Hashim*, 316 F.3d 1032, 1038 (9th Cir. 2003) (citation and internal quotation marks omitted). Where, as here, the appellant does not dispute the district court's factual findings, we are required to determine "whether the court employed the appropriate legal standards governing the issuance of a preliminary injunction and whether the district court correctly apprehended the law with respect to the underlying issues in the case." *A & M Records, Inc.*, 239 F.3d at 1013 (internal quotation and citation omitted). The district court's interpretation of the underlying legal principles is subject to de novo review. *Id.* We may affirm the district court's order "on any ground supported by the record even if it differs from the rationale of the district court." *Nat'l Wildlife Fed'n v. United States Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir. 2004).

## V. Analysis

**1.  Freedom of Speech Claim**

The district court concluded that Harper failed to demonstrate a likelihood of success on the merits of his claim that the School violated his First Amendment right to free speech because, under *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, the evidence in the record was sufficient to permit the school officials to "reasonably . . . forecast substantial disruption of or material interference with school activities." 393 U.S. 503, 514 (1969). Harper contends that the district

court erred in rejecting his free speech claim on three grounds: (1) his speech is protected under the Supreme Court's holdings in *Tinker* and *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675 (1986); (2) the School's actions and policies amount to viewpoint discrimination under *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); and (3) the School's dress code and speech policies are overbroad under *Bd. of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987).[11]  We affirm the district court's denial of the requested

---

[11]We need not rule upon the validity of the School's dress code or other anti-harassment policies in order to determine whether the district court abused its discretion in denying the preliminary injunction.  Harper's motion for a preliminary injunction sought only to enjoin school officials "from continuing their violation of the constitutional rights of Plaintiff Tyler Chase Harper."  The only violation alleged was that Harper was precluded from wearing his T-shirt with its demeaning message while at school.  The motion did not seek to enjoin the enforcement of the School's dress code or any other school policies against any and all students, but sought only to stop the violation of Harper's purported constitutional right to wear his T-shirt.  Our affirmance of the district court order does not depend upon the existence of a valid school policy or code.  Under *Tinker*, the School is permitted to prohibit Harper's conduct, with or without a valid anti-harassment or other policy, if it can demonstrate that the restriction was necessary to prevent either the violation of the rights of other students or substantial disruption of school activities.  The record is clear that even though Harper's teacher and Vice Principal Antrim stated that the T-shirt violated the dress code, the school officials made plain to Harper that the reason he could not wear the T-shirt was because of its effect upon other students and its disruptive effect upon the educational environment, rather than because it was prohibited by a dress code.  The district judge apparently concluded that the validity of the School's anti-harassment policies was not before him, or that it was not necessary to decide that question, and we cannot say that his determination was unreasonable.  Finally, we

(continued...)

13

preliminary injunction.  Although we, like the district court, rely on *Tinker*, we rely on a different provision – that schools may prohibit speech that "intrudes upon . . . the rights of other students."  *Tinker*, 393 U.S. at 508.

### a. Student Speech Under *Tinker*

Public schools are places where impressionable young persons spend much of their time while growing up.  They do so in order to receive what society hopes will be a fair and full education – an education without which they will almost certainly fail in later life, likely sooner rather than later.  *See Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954) ("[I]t is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.").  The public school, with its free education, is the key to our democracy.  *See id.* (stating that public education "is the very foundation of good citizenship").  Almost all

---

[11](...continued)
would prefer not to make even a preliminary judgment as to the constitutionality of the School's dress code or anti-harassment policies without the district court first having considered the question.  Of course, following remand, the district court may do so at the appropriate time or upon the appropriate motion.  In contrast, our dissenting colleague would have us engage on appeal in a sweeping examination *ab initio* of the validity of a complicated series of policies – an examination that would cause us to discuss prematurely a number of controversial constitutional issues.  *See* dis. op. at 22-36.  We see no need for such an exercise of our jurisdiction on this appeal.

young Americans attend public schools.[12]  During the time they do – from first

grade through twelfth – students are discovering what and who they are.  Often,

they are insecure.  Generally, they are vulnerable to cruel, inhuman, and prejudiced

treatment by others.

The courts have construed the First Amendment as applied to public schools

in a manner that attempts to strike a balance between the free speech rights of

students and the special need to maintain a safe, secure and effective learning

environment.  *See, e.g., Tinker*, 393 U.S. at 507 (balancing the need for

"scrupulous protection of Constitutional freedoms of the individual" against the

need of schools to perform their proper educational function).  This court has

expressly recognized the need for such balance: "States have a compelling interest

in their educational system, and a balance must be met between the First

Amendment rights of students and preservation of the educational process."

*LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 988 (9th Cir. 2001).  Although public

---

[12]As of the fall of 2005, approximately eighty-eight percent of elementary and secondary students in the United States attended public schools.  *See* DIGEST OF EDUCATION STATISTICS, 2004, NAT'L CTR. FOR EDUC. STATISTICS (2004), *available at* http://nces.ed.gov/programs/digest/d04/.  Most of the rest attended religious schools.  *See* STEPHEN P. BROUGHMAN & KATHLEEN W. PUGH, CHARACTERISTICS OF PRIVATE SCHOOLS IN THE UNITED STATES: RESULTS FROM THE 2001–2002 PRIVATE SCHOOL UNIVERSE SURVEY (U.S. Department of Education, National Center for Education Statistics) (2005).

school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker*, 393 U.S. at 506, the Supreme Court has declared that "the First Amendment rights of students in public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment."[13] *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (internal citation and quotation marks omitted). Thus, while Harper's shirt embodies the very sort of political speech that would be afforded First Amendment protection outside of the public school setting, his rights in the case before us must be determined "in light of [those] special characteristics." *Tinker*, 393 U.S. at 506.

This court has identified "three distinct areas of student speech," each of which is governed by different Supreme Court precedent: (1) vulgar, lewd, obscene, and plainly offensive speech which is governed by *Fraser*,[14] (2) school-

---

[13]Although Harper correctly points out that California law provides greater protection for student speech than federal law, *see* Cal. Educ. Code § 48950(a), he did not raise a state law claim in his preliminary injunction motion before the district court. Nor did he question, as he does in his brief to us, the constitutionality of the correlative provisions of the California Education Code that provide greater protection than federal law against harassment of students on the basis of sexual orientation. *See* Cal. Educ. Code §§ 200, 201, 220. Accordingly, we do not rely on or resolve any state law questions here.

[14]Because we decide Harper's free speech claim on the basis of *Tinker*, we
(continued...)

16

sponsored speech which is governed by *Hazelwood*,[15] and (3) all other speech which is governed by *Tinker*. *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 529 (9th Cir. 1992) (internal citations omitted).

In *Tinker*, the Supreme Court confirmed a student's right to free speech in public schools.[16] In balancing that right against the state interest in maintaining an ordered and effective public education system, however, the Court declared that a student's speech rights could be curtailed under two circumstances. First, a school may regulate student speech that would "impinge upon the rights of other students." *Tinker*, 393 U.S. at 509. Second, a school may prohibit student speech that would result in "substantial disruption of or material interference with school activities." *Id*. at 514. Because, as we explain below, the School's prohibition of the wearing of the demeaning T-shirt is constitutionally permissible under the first of the *Tinker* prongs, we conclude that the district court did not abuse its discretion

---

[14](...continued)
need not consider whether his speech was "plainly offensive" under *Fraser*.

[15]Neither party here claims that Harper's speech is "school-sponsored" and thus governed by *Hazelwood*.

[16]In *Tinker*, the Supreme Court held that a public school could not ban students from wearing black armbands protesting the Vietnam war where the "silent, passive expression of opinion [was] unaccompanied by any disorder or disturbance," and there was no evidence that the display "colli[ded] with the rights of other students to be secure and to be let alone." 393 U.S. at 508.

in finding that Harper failed to demonstrate a likelihood of success on the merits of his free speech claim.[17]

### i.    **The Rights of Other Students**

In *Tinker*, the Supreme Court held that public schools may restrict student speech which "intrudes upon . . . the rights of other students" or "colli[des] with the rights of other students to be secure and to be let alone." 393 U.S. at 508. Harper argues that *Tinker*'s reference to the "rights of other students" should be construed narrowly to involve only circumstances in which a student's right to be free from direct physical confrontation is infringed. Drawing on the Fifth Circuit's opinion in *Blackwell v. Issaquena County Bd. of Ed.,* 363 F.2d 749, 751 (5th Cir. 1966), which the Supreme Court cited in *Tinker*, Harper contends that because the

---

[17]The first part of our colleague's dissent is devoted to a discussion of whether there was sufficient evidence that the wearing of Harper's T-shirt caused substantial disruption, the *Tinker* prong on which the district court relied but which is not relevant to our holding. *See* dis. op. at 3-9. The last part of the dissent also deals with a subject we need not and do not address: what the dissent terms the School's "harassment policy." *Id.* at 22-36; *see also supra* n. 11. Oddly, the dissent spends only a relatively minor part of its discussion on the determinative issue here, the impermissible intrusion on the rights of gay and lesbian students. *Id*. at 13-22. Even more oddly, in its Conclusion the dissent suggests that speech that is fundamentally offensive to minority students may be constitutionally limited and quarrels only with whether such a limitation is consistent with the wording of *Tinker. Id*. at 36-37. It also suggests that the Supreme Court might properly modify *Tinker* and validate our holding. *Id*. at 37. We disagree that any modification of *Tinker* is required or desirable. All that is necessary is a fair reading of its plain language, as we explain in the following section.

18

speakers in *Blackwell* "accosted other students by pinning the buttons on them even though they did not ask for one," a student must be physically accosted in order to have his rights infringed.

Notwithstanding the facts of *Blackwell,* the law does not support Harper's argument. This court has explained that vulgar, lewd, obscene, indecent, and plainly offensive speech "by definition, may well 'impinge[] upon the rights of other students,'" even if the speaker does not directly accost individual students with his remarks. *Chandler*, 978 F.2d at 529 (quoting *Tinker*, 393 U.S. at 509). So too may other speech capable of causing psychological injury. The Tenth Circuit has held that the "display of the Confederate flag might . . . interfere with the rights of other students to be secure and let alone," even though there was no indication that any student was physically accosted with the flag, aside from its general display. *West v. Derby Unified Sch. Dist.*, 206 F.3d 1358, 1366 (10th Cir. 2000). While "[t]he precise scope of *Tinker*'s 'interference with the rights of others' language is unclear," *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3rd Cir. 2001), we unequivocally reject Harper's overly narrow reading of the phrase.

We conclude that Harper's wearing of his T-shirt "colli[des] with the rights of other students" in the most fundamental way. *Tinker*, 393 U.S. at 508. Public school students who may be injured by verbal assaults on the basis of a core

19

identifying characteristic such as race, religion, or sexual orientation, have a right to be free from such attacks while on school campuses. As *Tinker* clearly states, students have the right to "be secure and to be let alone." *Id*. Being secure involves not only freedom from physical assaults but from psychological attacks that cause young people to question their self-worth and their rightful place in society.[18] The "right to be let alone" has been recognized by the Supreme Court, of course, as "'the most comprehensive of rights and the right most valued by civilized men.'" *Hill v. Colorado*, 530 U.S. 703, 716-17 (2000) (quoting *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)). Indeed, the "recognizable privacy interest in avoiding unwanted communication" is perhaps most important "when persons are 'powerless to avoid' it." *Id*. at 716 (quoting *Cohen v. California*, 403 U.S. 15, 21-22 (1971)). Because minors are subject to mandatory attendance requirements, the Court has emphasized "the obvious concern on the part of parents, and school authorities acting *in loco parentis*, to protect children – especially in a captive audience . . . ." *Fraser*, 478 U.S. at 684.

---

[18]There is nothing in *Tinker* that remotely supports the dissent's contention that the rights to "be secure and to be let alone" are limited to rights such as those that protect against "assault, defamation, invasion of privacy, extortion and blackmail." Dis. op. at 14. Security and privacy entail far more than freedom from those torts. Nor does the dissent offer any reason why the rights to security and privacy do not include freedom from verbal assaults that cause psychological injury to young people.

Although name-calling is ordinarily protected outside the school context, "[s]tudents cannot hide behind the First Amendment to protect their 'right' to abuse and intimidate other students at school." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 264 (3rd Cir. 2002).

Speech that attacks high school students who are members of minority groups that have historically been oppressed, subjected to verbal and physical abuse, and made to feel inferior, serves to injure and intimidate them, as well as to damage their sense of security and interfere with their opportunity to learn.[19] The demeaning of young gay and lesbian students in a school environment is detrimental not only to their psychological health and well-being, but also to their educational development. Indeed, studies demonstrate that "academic underachievement, truancy, and dropout are prevalent among homosexual youth and are the probable consequences of violence and verbal and physical abuse at school." Susanne M. Stronski Huwiler and Gary Remafedi, *Adolescent Homosexuality*, 33 REV. JUR. U.I.P.R. 151, 164 (1999); *see also* Thomas A. Mayes,

---

[19]California law provides that "[a]ll pupils have the right to participate fully in the educational process, free from discrimination and harassment." Cal. Educ. Code § 201(a). The dissent expostulates on the meaning of the term "harassment" and speculates as to whether the California statute may be contrary to the First Amendment, all of which is irrelevant here because we do not rely on the statute in reaching our decision. *See* dis. op. at 13-15.

*Confronting Same-Sex, Student-to-Student Sexual Harassment: Recommendations for Educators and Policy Makers*, 29 FORDHAM URB. L.J. 641, 655 (2001) (describing how gay students are at a greater risk of school failure and dropping out, most likely as a result of "social pressure and isolation"); Amy Lovell, *"Other Students Always Used to Say, 'Look At The Dykes'": Protecting Students From Peer Sexual Orientation Harassment*, 86 CAL. L. REV. 617, 625-28 (1998) (summarizing the negative effects on gay students of peer sexual orientation harassment).  One study has found that among teenage victims of anti-gay discrimination, 75% experienced a decline in academic performance, 39% had truancy problems and 28% dropped out of school.  *See* Courtney Weiner, Note, *Sex Education: Recognizing Anti-Gay Harassment as Sex Discrimination Under Title VII and Title IX*, 37 COLUM. HUM. RTS. L. REV. 189, 225 (2005).  Another study confirmed that gay students had difficulty concentrating in school and feared for their safety as a result of peer harassment, and that verbal abuse led some gay students to skip school and others to drop out altogether.  HUMAN RIGHTS WATCH, HATRED IN THE HALLWAYS (1999), http://hrw.org/reports/2001/uslgbt/Final-05.htm#P609_91364.  Indeed, gay teens suffer a school dropout rate over three times the national average.  NAT'L MENTAL HEALTH ASS'N, BULLYING IN SCHOOLS: HARASSMENT PUTS GAY YOUTH AT RISK,

http://www.nmha.org/pbedu/backtoschool/bullyingGayYouth.pdf; *see also*

Maurice R. Dyson, *Safe Rules or Gays' Schools? The Dilemma of Sexual*

*Orientation Segregation in Public Education*, 7 U. PA. J. CONST. L. 183, 187

(2004) (gay teens face greater risks of "dropping out [and] performing poorly in

school"); Kelli Armstrong, *The Silent Minority Within a Minority: Focusing on the*

*Needs of Gay Youth in Our Public Schools*, 24 GOLDEN GATE U. L. REV. 67, 76-77

(1994) (describing how abuse by peers causes gay youth to experience social

isolation and drop out of school).  In short, it is well established that attacks on

students on the basis of their sexual orientation are harmful not only to the

students' health and welfare, but also to their educational performance and their

ultimate potential for success in life.

Those who administer our public educational institutions need not tolerate

verbal assaults that may destroy the self-esteem of our most vulnerable teenagers

and interfere with their educational development.[20]  *See Muller by Muller v.*

*Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1540 (7th Cir. 1996) (stating that

elementary schools may restrict speech "that could crush a child's sense of

self-worth"); *Saxe*, 240 F.3d at 217 (observing that speech that "substantially

---

[20]In fact, California schools like Poway High are required by law "to minimize and eliminate a hostile environment on school grounds that impairs the access of pupils to equal educational opportunity."  Cal. Educ. Code § 201(f).

interfer[es] with a student's educational performance" may satisfy the *Tinker*

standard).[21]  To the contrary, the School had a valid and lawful basis for restricting

Harper's wearing of his T-shirt on the ground that his conduct was injurious to gay

and lesbian students and interfered with their right to learn.[22]

The dissent claims that we should not take notice of the fact that gay

students are harmed by derogatory messages such as Harper's because there is no

---

[21]*Saxe* considered the validity of a school district's anti-harassment policy, a question we do not address here.  *See supra* n.11.  Although in its discussion of a provision regarding "hostile environment," *Saxe* briefly alludes to the "interference with the rights of others" prong of *Tinker*, it appears to conflate that prong with the "substantial disruption" prong and to suggest, perhaps inadvertently, that injurious slurs may not be prohibited unless they also cause substantial disruption.  *See Saxe*, 240 F.3d at 217.  That clearly is not the case.  The two *Tinker* prongs are stated in the alternative.  *See Tinker*, 393 U.S. at 508. We agree, however, with *Saxe*'s conclusion that "it is certainly not enough that the speech is merely offensive to some listener."  *Saxe*, 240 F.3d at 217.

[22] As noted *supra*, California law explicitly recognizes the right of students to be free from harassment on the basis of sexual orientation.  *See* Cal. Educ. Code § 200, 201.  These provisions were enacted not in a vacuum, but out of a recognition on the part of the state legislature of "an urgent need to prevent and respond to acts of hate violence and bias-related incidents that are occurring at an increasing rate in California's public schools."  *Id*. at § 201(d).  We also observe that federal law provides public school students some protection against harassment and discriminatory treatment based on sexual orientation.  For example, in *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134-35 (9th Cir. 2003), we held that the Equal Protection Clause protects against school districts' indifference to certain kinds of negative speech aimed at gay students.  *See also* Mayes, *supra*, at 643 (observing that harassment based on sexual orientation may be actionable under Title IX as harassment based on sex).

24

"evidence" that they are in fact injured by being shamed or humiliated by their peers. *See* dis. op. at 15-18. It is simply not a novel concept, however, that such attacks on young minority students can be harmful to their self-esteem and to their ability to learn. As long ago as in *Brown v. Board of Education*, the Supreme Court recognized that "[a] sense of inferiority affects the motivation of a child to learn." 347 U.S. at 494 (internal quotation marks omitted). If a school permitted its students to wear shirts reading, "Negroes: Go Back To Africa," no one would doubt that the message would be harmful to young black students. So, too, in the case of gay students, with regard to messages such as those written on Harper's T-shirt.[23] As our dissenting colleague recently concluded, "[y]ou don't need an expert witness to figure out" the self-evident effect of certain policies or messages. *Jespersen v. Harrah's Operating Co., Inc.*, No. 03-15045, 2006 WL 962533, at *13 (9th Cir. April 14, 2006) (Kozinski, Circuit Judge, dissenting). Just as Judge

---

[23]There is much literature to this effect. *See supra* pp. 21-23. Our dissenting colleague's notion of "evidence" appears to be rather odd. It seems to consist largely of motion pictures and television shows. The dissent draws conclusions that it is "not unusual in a high school classroom for students to be 'off-task'" and that politics and other subjects "are the ordinary subjects of discourse in high school corridors" on the basis of our colleague's viewing of a number of popular entertainment features. *See* dis. op. at 4 n.2 & 5 n.3. Perhaps he would prefer us to cite *Brokeback Mountain* (Paramount Pictures 2005) or *The Matthew Shepard Story* (2002), as evidence of the harmful effects of anti-gay harassment rather than simply stating that which, to anyone familiar with or in any way sensitive to, the history or effect of discrimination, is a self-evident fact.

25

Kozinski found it to be "perfectly clear" – *without the aid of any evidence in the record* – that an employer's makeup requirement burdened women, the fact that Harper's demeaning statement is harmful to gay students at Poway High "hardly seem[s] like [a] question[] reasonably subject to dispute." *Id*. at *12. One would think that if we should be able to take notice of how long it takes women to put on makeup, or that makeup is an expensive item, we can certainly take notice that it is harmful to gay teenagers to be publicly degraded and called immoral and shameful.[24] Certainly, the California legislature had no difficulty in determining that harassment on the basis of sexual orientation adversely affects the rights of public high school students. *See* Cal. Educ. Code § 201(c).[25]

The dissent takes comfort in the fact that there is a political disagreement regarding homosexuality in this country. *See* dis. op. at 12. We do not deny that

---

[24]We should point out that we are considering here whether to reverse a denial of a preliminary injunction. The extent to which a self-evident proposition must be established in order to avoid such a reversal under an abuse of discretion standard is not necessarily the same as may be required at a trial on the merits, although we express no view on the latter question.

[25]Although we do not rely on the California statute to support our holding, we note that the Legislature, in the California Schools Hate Violence Reduction Act of 1995, declared: "Harassment on school grounds directed at an individual on the basis of personal characteristics or status creates a hostile environment and *jeopardizes equal educational opportunity* as guaranteed by the California Constitution and the United States Constitution." Cal. Educ. Code. § 201(c) (emphasis added).

26

there is, just as there was a longstanding political disagreement about racial

equality that reached its peak in the 1950's and about whether religious minorities

should hold high office that lasted at least until after the 1960 presidential

election,[26] or whether blacks or Jews should be permitted to attend private

universities and prep schools, work in various industries such as banks, brokerage

houses, and Wall Street law firms, or stay at prominent resorts or hotels.  Such

disagreements may justify social or political debate, but they do not justify students

in high schools or elementary schools assaulting their fellow students with

demeaning statements: by calling gay students shameful, by labeling black students

inferior or by wearing T-shirts saying that Jews are doomed to Hell.  Perhaps our

dissenting colleague believes that one can condemn homosexuality without

condemning homosexuals.  If so, he is wrong.  To say that homosexuality is

shameful is to say, necessarily, that gays and lesbians are shameful.  There are

numerous locations and opportunities available to those who wish to advance such

---

[26]For example, in the late 19th century, James G. Blaine ran for President in a campaign that is remembered for its slogan of "Rum, Romanism and Rebellion." *See* Richard G. Bacon, *Rum, Romanism and Romer*, 6 DEL. L. REV. 1, 39-40 (2003); *see also* Joseph P. Viteritti, *Davey's Plea: Blaine, Blair, Witters, and the Protection of Religious Freedom*, 27 HARV. J. L. & PUB. POL'Y 299, 311 (2003) (citation omitted) (observing that Blaine's campaign for the Republican nomination "was built around his (and the party's) opposition to 'Rum, Romanism, and Rebellion.'").

an argument. It is not necessary to do so by directly condemning, to their faces, young students trying to obtain a fair and full education in our public schools.

Our dissenting colleague also appears to believe that the fact that Harper wore his T-shirt in response to a "Day of Silence" somehow lessens the injurious effect of his act because by participating in the gay rights event, gay students "perforce acknowledge that their status is not universally admired or respected." Dis. op. at 19. This argument is completely without merit. The fact that gays, or for that matter blacks, Jews, or Latinos, recognize that they are the subject of prejudice and are not "respected" or considered equal by some in certain public schools in this country does not mean that they are not injured when the usually unspoken prejudice turns into harmful verbal conduct. Moreover, the dissent's assertion that gay students may prefer to see the demeaning statements contained on Harper's T-shirt rather than on bathroom walls makes even less sense. *See id*. The First Amendment does not justify students launching such injurious and harmful personal attacks in either location.

What we hold in this opinion is a far cry from what the dissent suggests. We do not hold that schools may "define civic responsibility and then ban opposing points of view." *Id*. at 10 n.7. The question of what types of assemblies schools should or may conduct regarding controversial public issues or what types of

28

speech students may otherwise generally engage in regarding such issues is not before us. Different circumstances require different results. We consider here only whether schools may prohibit the wearing of T-shirts on high school campuses and in high school classes that flaunt demeaning slogans, phrases or aphorisms relating to a core characteristic of particularly vulnerable students and that may cause them significant injury. We do not believe that the schools are forbidden to regulate such conduct. Nor, contrary to the dissent, do we believe that because a school sponsors or permits a "Day of Tolerance" or a "Day of Silence" minority students should be required to publicly "[c]onfront[]" and "refut[e]" demeaning verbal assaults on them – that they may be left with no option other than to try to justify their sexual practices to the entire student body or explain to all their fellow students why they are not inferior or evil. *Id*. at 19. The First Amendment does not require that young students be subjected to such a destructive and humiliating experience.

In his declaration in the district court, the school principal justified his actions on the basis that "any shirt which is worn on campus which speaks in a derogatory manner towards an individual or group of individuals is not healthy for young people . . . ." If, by this, the principal meant that all such shirts may be banned under *Tinker*, we do not agree. T-shirts proclaiming, "Young Republicans

29

Suck," or "Young Democrats Suck," for example, may not be very civil but they would certainly not be sufficiently damaging to the individual or the educational process to warrant a limitation on the wearer's First Amendment rights. Similarly, T-shirts that denigrate the President, his administration, or his policies, or otherwise invite political disagreement or debate, including debates over the war in Iraq, would not fall within the "rights of others" *Tinker* prong.[27]

Although we hold that the School's restriction of Harper's right to carry messages on his T-shirt was permissible under *Tinker*, we reaffirm the importance of preserving student speech about controversial issues generally and protecting the bedrock principle that students "may not be confined to the expression of those sentiments that are officially approved." *Tinker*, 393 U.S. at 511; *see also Fraser*, 478 U.S. at 681 (noting students' "freedom to advocate unpopular and controversial views in schools and classrooms"). It is essential that students have the opportunity to engage in full and open political expression, both in and out of the school environment. Engaging in controversial political speech, even when it

---

[27]The dissent suggests that our decision might somehow allow a school to restrict student T-shirts that voice strongly-worded opposition to the war in Iraq. *See* dis. op. at 12. That is not so. Our colleague ignores the fact that our holding is limited to injurious speech that strikes at a core identifying characteristic of students on the basis of their membership in a minority group. The anti-war T-shirts posited by the dissent constitute neither an attack on the basis of a student's core identifying characteristic nor on the basis of his minority status.

is offensive to others, is an important right of all Americans and learning the value of such freedoms is an essential part of a public school education. Indeed, the inculcation of "the fundamental values necessary to the maintenance of a democratic political system" is "truly the 'work of the schools.'" *Fraser*, 478 U.S. at 683 (quoting *Tinker*, 393 U.S. at 508). Limitations on student speech must be narrow, and applied with sensitivity and for reasons that are consistent with the fundamental First Amendment mandate. Accordingly, we limit our holding to instances of derogatory and injurious remarks directed at students' minority status such as race, religion, and sexual orientation.[28] Moreover, our decision is based

_____

[28]We do not consider here whether remarks based on gender warrant similar treatment, preferring to leave that question to another time. We recognize, however, that problems of gender discrimination remain serious and that they exist throughout learning institutions, from the public and religious schools to institutions of higher learning, not excluding the most prominent institutions in the nation.

Our dissenting colleague worries that offensive words directed at majority groups such as Christians or whites will not be covered by our holding. *See* dis. op. at 21. There is, of course, a difference between a historically oppressed minority group that has been the victim of serious prejudice and discrimination and a group that has always enjoyed a preferred social, economic and political status. Growing up as a member of a minority group often carries with it psychological and emotional burdens not incurred by members of the majority. In any event, any verbal assault targeting majorities that might justify some form of action by school officials is more likely to fall under the "substantial disruption" prong of *Tinker* or under the *Fraser* rule permitting schools to prohibit "plainly offensive" speech. 478 U.S. at 683; *cf. Frederick v. Morse*, 439 F.3d 1114, 1122 n.44 (9th Cir. 2006) (observing that *Fraser* "only enables schools to prevent the sort of vulgar, obscene,

(continued...)

31

not only on the type and degree of injury the speech involved causes to impressionable young people, but on the locale in which it takes place. *See Tinker*, 393 U.S. at 506 (student rights must be construed "in light of the special characteristics of the school environment"). Thus, it is limited to conduct that occurs in public high schools (and in elementary schools). As young students acquire more strength and maturity, and specifically as they reach college age, they become adequately equipped emotionally and intellectually to deal with the type of verbal assaults that may be prohibited during their earlier years. Accordingly, we do not condone the use in public colleges or other public institutions of higher learning of restrictions similar to those permitted here.

Finally, we emphasize that the School's actions here were no more than necessary to prevent the intrusion on the rights of other students. Aside from prohibiting the wearing of the shirt, the School did not take the additional step of punishing the speaker: Harper was not suspended from school nor was the incident made a part of his disciplinary record.

Under the circumstances present here, we conclude that the School's actions did not extend beyond the scope of the restrictions permitted by *Tinker*, and that

---

[28](...continued)
lewd or sexual speech that, specially with adolescents, readily promotes disruption")

32

the district court did not abuse its discretion in finding that Harper failed to demonstrate a likelihood of success on the merits of his free speech claim.

ii. **Substantial Disruption**

The district court concluded that Harper had failed to demonstrate a likelihood of success on the merits of his free speech claim because there was sufficient evidence to permit the school officials to "reasonably . . . forecast substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514. In so holding, the district court relied on the declarations of Principal Fisher, Assistant Principal Antrim, and LeMaster which described how the previous year's "Day of Silence" had resulted in "volatile behavior" and "tensions between students," including physical altercations. The court also cited LeMaster's testimony that he had observed disruption in the class that Harper attended while wearing the T-shirt, and Principal Fisher's testimony that Harper told him that a "tense verbal conversation with a group of students" had already taken place due to the T-shirt's message.

In light of our conclusion regarding the application of the "rights of others" prong of *Tinker*, we have no cause to decide whether the evidence would be

sufficient to warrant denial of a preliminary injunction under the "substantial

disruption" prong as well.[29]

### b.    Viewpoint Discrimination

In reaching our decision that Harper may lawfully be prohibited from

wearing his T-shirt, we reject his argument that the School's action constituted

impermissible viewpoint discrimination. The government is generally prohibited

---

[29]Our recent decision in *Frederick v. Morse*, 439 F.3d 1114 (9th Cir. 2006), is in no respect inconsistent with this opinion. In *Frederick*, we held that a public high school's suspension of a student for displaying off campus, during the running of the Winter Olympics Torch Relay, a banner that read "Bong Hits 4 Jesus," violated *Tinker*. *Frederick* differs from the present case in four fundamental ways. First and foremost, *Frederick* did not address the "intrudes upon the rights of others" prong of *Tinker*, the ground upon which we base our holding here. Rather, the only issue in *Frederick* was whether the other *Tinker* prong – "substantial disruption" – was applicable. Second, in *Frederick* we concluded that the school's actions did not meet the "substantial disruption" prong because the school officials conceded that they punished the student's display of the banner *not* out of "concern that it would cause disruption" but because "the speech promotes a social message contrary to the one favored by the school." *Id.* at 1117-18. Here, although in view of our holding, we need not (and do not) consider the "substantial disruption" prong of *Tinker*, the School presented evidence that it restricted Harper's wearing of the T-shirt because it expected that his doing so would cause substantial disruption. Third, *Frederick* involved punishing student speech that took place "outside the classroom, across the street from the school, during a non-curricular activity that was only partially supervised by school officials." *Id.* at 1123. By contrast, Harper wore the offending T-shirt not only on campus, but inside the classroom. Finally, in the case before us, the School adopted the least restrictive means of curing the injury; it simply forbade the wearing of the garment. In *Frederick*, in contrast, the school authorities punished the student harshly for the purported (but non-existent) offense by suspending him for ten days. *Id.* at 1116.

from regulating speech "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. However, as the district court correctly pointed out, speech in the public schools is not always governed by the same rules that apply in other circumstances. *See Hazelwood*, 484 U.S. at 266; *Fraser*, 478 U.S. at 685; *West*, 206 F.3d at 1366 (schools may ban student speech that "could well be considered a form of political speech to be afforded First Amendment protection outside the educational setting"). Indeed, the Court in *Tinker* held that a school may prohibit student speech, even if the consequence is viewpoint discrimination, if the speech violates the rights of other students or is materially disruptive. *See Tinker*, 393 U.S. at 511 (stating school cannot prohibit "expression of one particular opinion" unless it makes a specific showing of constitutionally valid reasons); *see also Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 615 (5th Cir. 2004) (stating that *Tinker* "applies to school regulations directed at specific student viewpoints"); *Muller by Muller*, 98 F.3d at 1538 (emphasis added) (observing difference between suppressing religious speech "solely because it is religious" and suppressing speech that is "religious *and* disruptive or hurtful"). Thus, pursuant to *Tinker*, courts have allowed schools to ban the display of Confederate flags despite the fact that such a ban may constitute viewpoint discrimination. *See Scott*, 324 F.3d at

1248 (upholding ban on Confederate flag where school officials presented evidence of racial tensions at the school); *West*, 206 F.3d at 1366 (same). While the Confederate flag may express a particular viewpoint, "[i]t is not only constitutionally allowable for school officials" to limit the expression of racially explosive views, "it is their duty to do so." *Scott*, 324 F.3d at 1249. Because, as we have already explained, the record demonstrates that Harper's speech intruded upon the rights of other students, the School's restriction is permissible under *Tinker*, and we must reject Harper's viewpoint discrimination claim.[30]

The dissent claims that although the School may have been justified in banning discussion of the subject of sexual orientation altogether, it cannot "gag[] only those who oppose the Day of Silence." Dis. op. at 11. As we have explained, however, although *Tinker* does not allow schools to restrict the non-invasive, non-disruptive expression of political viewpoints, it does permit school authorities to restrict "one particular opinion" if the expression would "impinge upon the rights

---

[30]The cases on which Harper relies to support his viewpoint discrimination claim involve the entirely different question whether schools may deny student groups access to school resources on the basis of their religious viewpoint. *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 386-87 (1993) (school allowed use of school facilities for private groups, but prohibited "meetings for religious purposes"); *Prince v. Jacoby*, 303 F.3d 1074, 1090 (9th Cir. 2002) (school allowed student clubs access to school facilities but excluded student Bible club). Those cases are not relevant here.

of other students" or substantially disrupt school activities. *Tinker*, 393 U.S. at 509, 511. Accordingly, a school may permit students to discuss a particular subject without being required to allow them to launch injurious verbal assaults that intrude upon the rights of other students.

"A school need not tolerate student speech that is inconsistent with its basic educational mission, [] even though the government could not censor similar speech outside the school." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (citation and internal quotation marks omitted). Part of a school's "basic educational mission" is the inculcation of "fundamental values of habits and manners of civility essential to a democratic society." *Fraser*, 478 U.S. at 681 (internal quotation marks omitted). For this reason, public schools may permit, and even encourage, discussions of tolerance, equality and democracy without being required to provide equal time for student or other speech espousing intolerance, bigotry or hatred. As we have explained, *supra* pp. 28-29, because a school sponsors a "Day of Religious Tolerance," it need not permit its students to wear T-shirts reading, "Jews Are Christ-Killers" or "All Muslims Are Evil Doers." Such expressions would be "wholly inconsistent with the 'fundamental values' of public school education." *Id*. at 685-86. Similarly, a school that permits a "Day of Racial Tolerance," may restrict a student from displaying a swastika or a

37

Confederate Flag. *See West*, 206 F.3d at 1365-66. In sum, a school has the right to teach civic responsibility and tolerance as part of its basic educational mission; it need not as a quid pro quo permit hateful and injurious speech that runs counter to that mission.[31]

We again emphasize that we do not suggest that all debate as to issues relating to tolerance or equality may be prohibited. As we have stated repeatedly, we consider here only the question of T-shirts, banners, and other similar items bearing slogans that injure students with respect to their core characteristics. Other issues must await another day.

## 2. Free Exercise of Religion Claim

Harper also contends that the district court erred because he was entitled to a preliminary injunction as a result of the School's violation of his rights under the Free Exercise Clause. He asserts that his wearing of the T-shirt was "motivated by sincerely held religious beliefs" regarding homosexuality[32] and that the School

---

[31]We note, incidentally, that the incident in question occurred on the day after the "Day of Silence," and not on the day itself.

[32]We do not, of course, consider whether Harper's views are consistent with his religion, nor do we ask whether his religion truly encourages homophobic conduct. Similarly, we do not consider whether the isolated excerpt from the New Testament, *Romans 1:27*, is representative of Christian doctrine generally. All such inquiries are beyond the judiciary's authority. *See Hernandez v. C.I.R.*, 490

(continued...)

"punished" him for expressing them, or otherwise burdened the exercise of those views. Additionally, Harper argues that the School "attempted to change" his religious views and that this effort violated both the Free Exercise Clause and the Establishment Clause.

The Free Exercise Clause of the First Amendment provides that Congress shall make no law "prohibiting the free exercise" of religion. U.S. Const. amend. I. The Clause prohibits the government from "compel[ling] affirmation of religious belief, punish[ing] the expression of religious doctrines it believes to be false, impos[ing] special disabilities on the basis of religious views or religious status, or lend[ing] its power to one or the other side in controversies over religious authority or dogma." *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 877 (1990) (internal quotation marks and citations omitted).

In *Sherbert v. Verner,* the Supreme Court held that governmental actions that substantially burden a religious belief or practice must be justified by a compelling state interest and must be narrowly tailored to serve that interest. 374 U.S. 398, 402-03 (1963). The *Sherbert* test was later largely discarded in *Smith*, which held

_____

[32](...continued)
U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.")

that the "right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" 494 U.S. 872, 879 (1990) (citation omitted). The Court held that a neutral law of general applicability need not be supported by a compelling governmental interest even though it has the incidental effect of burdening religion. *See id*. at 885; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).[33] The Court noted, however, that a "hybrid claim," *i.e.*, a claim that involves "not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech," merits application of strict scrutiny*:* the law or action must be narrowly tailored to advance a compelling government interest. *Smith*, 494 U.S. at 881; *see also Miller v. Reed,* 176 F.3d 1202, 1207 (9th Cir. 1999) (same). Although it did not say so expressly, in *Smith* the Court preserved the *Sherbert* test for use in hybrid-rights cases. In order, however, "to assert a hybrid-rights claim, a free exercise plaintiff must make out a colorable claim that a companion right has been violated – that is,

_____

[33]"A law is one of neutrality and general applicability if it does not aim to 'infringe upon or restrict practices because of their religious motivation,' and if it does not 'in a selective manner impose burdens only on conduct motivated by religious belief[.]'" *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004) (quoting *Lukumi*, 508 U.S. at 546).

a fair probability or a likelihood, but not a certitude, of success on the merits." *Miller*, 176 F.3d at 1207 (internal citation and quotation marks omitted).

Harper does not contend that the School's prohibition against his wearing his T-shirt was motivated by other than secular reasons or that it was applied to him because of his religious views. Nor is there anything in the record to suggest that other students wearing T-shirts similarly demeaning of gay and lesbian members of the student body would be treated differently, Christians or not.[34] Under *Smith*, Harper's claim would surely fail. Harper asserts, however, that we should apply *Sherbert*'s strict scrutiny test to his free exercise claim because his is a "hybrid" claim involving the Free Exercise Clause in conjunction with other constitutional claims.[35] The School disagrees, arguing that the district court properly applied rational basis review under *Smith* because its prohibition of

---

[34]Harper does not argue that the School's ban on his wearing the injurious and demeaning T-shirt was arbitrary or capricious, only that it violated the First Amendment rights discussed herein.

[35]Although Harper refers to "other constitutional claims" and even "numerous constitutional claims," the only claim that has the potential to justify his invoking of "hybrid" status is the free speech claim.

Harper's speech involved a "valid and neutral [rule] of general applicability."[36]

*Smith*, 494 U.S. at 879.

We seriously doubt that there is "a fair probability or a likelihood" that

Harper's claim that a companion right – free speech – has been violated will

succeed on the merits, as required by *Miller*. 176 F.3d at 1207 (internal quotation

marks omitted).[37]  In fact, we are fairly confident that it will not, for the reasons we

have explained *supra* Part V.1.  Nevertheless, we need not decide whether Harper's

free exercise claim is properly deemed a "hybrid" claim, because, whether or not

*Sherbert*'s strict scrutiny test applies, Harper cannot prevail here.  "Under the

*Sherbert* test, governmental actions that substantially burden a religious practice

---

[36]The district court determined that, "without the free speech claim, plaintiff's free exercise claim does not require strict scrutiny."  It then ignored the free speech claim, apparently because it had already found that it was unlikely to succeed.  Applying rational basis review, the court concluded that the School's action was rationally based on a legitimate pedagogical concern, and that Harper failed to demonstrate that it was irrational or wholly arbitrary.

[37]We note that the School conceded in essence that the free speech claim was "colorable" for purposes of Harper's establishing "irreparable harm" – one of the factors that may in combination with others justify issuance of a preliminary injunction.  *See supra* pp. 10-12.  We need not consider, however, whether "colorable" has different meanings for purposes of irreparable harm under *Sammartano*, and for purposes of a hybrid claim under *Miller*, as we assume here that Harper's free speech claim *is* colorable for the latter purpose as well.

must be justified by a compelling governmental interest."[38] *Smith*, 494 U.S. at 883. In this case, Harper flunks the test in every respect.

Assuming that *Sherbert* applies, we must first consider whether the School's actions "substantially burden" a religious practice or belief. The record simply does not demonstrate that the School's restriction regarding Harper's T-shirt imposed a substantial burden upon the free exercise of Harper's religious beliefs. There is no evidence that the School "compell[ed] affirmation of a repugnant belief," "penalize[d] or discriminate[d] against [Harper] because [he] hold[s] religious views abhorrent to the authorities," or "condition[ed] the availability of benefits upon [Harper's] willingness to violate a cardinal principle of [his] religious faith." *Sherbert*, 374 U.S. at 402, 406. Nor did the School "lend its power to one or the other side in controversies over religious authority or dogma," or "punish the expression of religious doctrines it believes to be false." *Smith*, 494 U.S. at 877.

---

[38]We have described the *Sherbert* test as requiring the weighing of three factors: (1) how much the state action interferes with the exercise of religious beliefs; (2) whether there is a compelling state interest justifying a burden on religious beliefs; and (3) whether accommodating those beliefs would unduly interfere with the fulfillment of the government interest. *N.L.R.B. v. Hanna Boys Center*, 940 F.2d 1295, 1305 (9th Cir. 1991).

Despite Harper's allegation that the School "punished" him for expressing his religious views, the record demonstrates the contrary: the School did not punish Harper at all. It simply prohibited him from wearing the offensive and disruptive shirt and required him to refrain from attending class for a portion of a day, if he insisted on continuing to wear it. Nor did the restriction imposed on Harper's wearing of the T-shirt constitute a substantial limitation on his right to express his religious views. No one has the right to proclaim his views at all times in all manners in all places, regardless of the circumstances, and Harper does not contend that his religion suggests otherwise. Harper remains free to express his views, whatever their merits, on other occasions and in other places. The prohibition against the wearing of a T-shirt in school does not constitute a substantial burden on the exercise of his religious beliefs.

Even if a religious creed, or an individual's interpretation of that creed, could be said to require its adherents to proclaim their religious views at all times and in all places, and to do so in a manner that interferes with the rights of others, the First Amendment would not prohibit the state from banning such disruptive conduct in certain circumstances, including on a high school campus. The Constitution does not authorize one group of persons to force its religious views on others or to compel others to abide by its precepts. Nor does it authorize

individuals to engage in conduct, including speech, on the grounds of public schools, that is harmful to other students seeking to obtain a fair and equal education – even if those individuals hold a sincere belief that the principles of their religion require them to discriminate against others, or to publicly proclaim their discriminatory views whenever they believe that "evil" practices are being condoned. *See Sherbert*, 374 U.S. at 403 (internal quotation marks omitted) ("[E]ven when the action is in accord with one's religious convictions, it is not totally free from legislative restrictions."). Schools may prohibit students and others from disrupting the educational process or causing physical or psychological injury to young people entrusted to their care, whatever the motivations or beliefs of those engaged in such conduct. Indeed, the state's interest in doing so is compelling.

Because there is no evidence that the School's restriction on Harper's wearing of his T-shirt substantially burdened a religious practice or belief, and because the School has a compelling interest in providing a proper educational environment for its students and because its actions were narrowly tailored to achieve that end,[39] it would appear that the district court did not abuse its discretion

_____

[39]As discussed earlier, the School did no more than necessary to further its compelling interest in protecting the rights of students and maintaining a healthy

(continued...)

45

in finding that Harper failed to demonstrate a likelihood of success on the merits as to his free exercise of religion claim. Before reaching that conclusion, however, we must deal with one final argument that Harper raises as a part of that claim. Harper asserts that the School "attempted to change" his religious views that "homosexuality is harmful to both those who practice it and the community at large." Specifically, Harper alleges that the school officials' comments that his shirt was "inflammatory," Detective Hubbert's questioning of him, and Assistant Principal Giles' statement that he leaves his Christian faith in the car when he comes to school, all were attempts by school authorities to change his religious views.

The district court rejected Harper's contention. Indeed, there is no evidence in the record that the school representatives sought to change Harper's religious beliefs. Harper's complaint avers that Detective Hubbert "proposed to [Harper] that as a member of the Christian faith, he should understand that Christianity was based on love not hate, and that [he] should not be offensive to others." Hubbert's homily did not constitute an attempt to change Harper's religious views, simply his

_____

[39](...continued)
learning environment. It merely prohibited Harper from wearing the T-shirt at school, and did not even take the additional step of suspending or otherwise punishing him.

offensive behavior; at most, it was, as the district court concluded, an "option[]" presented to and left with" Harper. The statements that the message on Harper's shirt was "inflammatory" and would be harmful to the educational environment were merely statements of fact that represented the School's informed judgment. More important, like Hubbert's statement, they were designed to affect Harper's behavior not his beliefs. As for Giles' comments, his affidavit stated that he did not tell Harper to "leave his own faith in the car," but explained that, as a school employee, he, Giles, had to leave *his own* Christian faith in the car when he came to work. While Giles' statement might also be construed as an attempt to encourage Harper to change his conduct – to refrain, while on campus, from expressing religious views that denigrate others – it cannot be characterized as an attempt to change his views. In fact, rather than tell Harper to change his beliefs, Giles encouraged him to join the campus Bible Club so that he could become part of an "activity that would express his [Christian] opinions in a positive way on campus," an activity that was wholly consistent with Harper's religious views. The record thus does not support Harper's claim that the School violated his free exercise right by "attempting to change" his religious views.

Moreover, school officials' statements and any other school activity intended to teach Harper the virtues of tolerance constitute a proper exercise of a

47

school's educational function, even if the message conflicts with the views of a particular religion. A public school's teaching of secular democratic values does not constitute an unconstitutional attempt to influence students' religious beliefs. Rather, it simply reflects the public school's performance of its duty to educate children regarding appropriate secular subjects in an appropriate secular manner. As we have reiterated earlier, "the inculcation of fundamental values necessary to the maintenance of a democratic political system" is "truly the 'work of the schools.'" *Fraser*, 478 U.S. at 681, 683 (quoting *Ambach v. Norwick*, 441 U.S. 68, 76-77 (1979); quoting *Tinker*, 393 U.S. at 508). Public schools are not limited to teaching materials that are consistent with all aspects of the views of all religions. So long as the subject and materials are appropriate from an educational standpoint and the purpose of the instruction is secular, the school's teaching is not subject to a constitutional objection that it conflicts with a view held by members of a particular religion. There is no evidence here that the school officials' comments were associated with a religious, as opposed to a secular, purpose. Their affidavits demonstrate that the School acted in order to maintain a secure and healthy learning environment for all its students, not to advance religion.

The Constitution does not preclude school districts from teaching the essential elements of democracy or otherwise performing their proper educational

48

mission simply because some individuals or groups may assert that their religious views are inconsistent with the lessons taught as a part of that mission. Accordingly, we affirm the district court's decision that Harper was not entitled to a preliminary injunction on the basis of his free exercise claim.

**3.      Establishment Clause Claim**

Finally, we consider the district court's conclusion that Harper did not demonstrate a likelihood of success on the merits of his claim that the School violated the Establishment Clause by attempting to "coerce" him into changing his religious beliefs that "homosexuality is harmful to both those who practice it and the community at large."

Harper's Establishment Clause claim as presented on appeal appears to be simply a restatement of his Free Exercise claim.  In fact, as the Supreme Court has noted, its Establishment Clause cases "for the most part have addressed governmental efforts to *benefit* religion or particular religions," and thus allegations of an "attempt to *disfavor*" a religion, such as Harper's, are properly analyzed under the Free Exercise Clause.  *Lukumi*, 508 U.S. at 532 (emphasis added).  However, in the interest of thoroughness, we briefly address Harper's claim of "coercion" under the Establishment Clause.

Harper bases his claim almost entirely on the Supreme Court's statement in

*Lee v. Weisman*, that "at a minimum, the Constitution guarantees that government

may not coerce anyone to support or participate in religion or its exercise, or

otherwise act in a way which 'establishes a [state] religion or religious faith, or

tends to do so.'"[40]  505 U.S. 577, 587 (1992) (quoting *Lynch v. Donnelly*, 465 U.S.

668, 678 (1984)).  Here, there is no evidence that the School's actions were based

on anything other than an entirely secular and legitimate aim of protecting the

rights of students and promoting a tolerant and safe learning environment.  There is

certainly no evidence (or even allegation) that school authorities sought to coerce

or encourage Harper to participate in some other religion or to adopt some state-

supported or other religious faith.  To reiterate what we explained in the "Free

Exercise" section of this opinion, the teaching of secular democratic values does

not violate the First Amendment, even if that teaching conflicts in some respect

with a sincerely held view that a student or his parents may attribute to the

particular religion to which they adhere.

---

[40]The only other case upon which Harper relies for his coercion claim is
*Peloza v. Capistrano Unified Sch. Dist.*, in which this court observed that "[t]o
permit [a teacher] to discuss his religious beliefs with students during school time
on school grounds would violate the Establishment Clause."  37 F.3d 517, 522 (9th
Cir. 1994).  Like *Lee*, the case is inapposite as it involves the entirely different
issue of school-sanctioned religious speech which "would have the primary effect
of advancing religion, and would entangle the school with religion."  *Id.*

Government conduct does not violate the Establishment Clause when (1) it has a secular purpose, (2) its principal and primary effect neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement in religion. *See Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971). For the reasons we have already explained, the record supports the district court's conclusion that the School's actions "had a secular purpose, *i.e.*, promoting tolerance, and not advancing or inhibiting religion." It is also clear from the record that the primary effect of the School's banning of the T-shirt was not to advance or inhibit religion but to protect and preserve the educational environment and the rights of other members of the student body. Nor can there be any question in this case of excessive government entanglement in religion. Finally, as we have already discussed, there is no evidence in the record that school officials attempted to change Harper's religious beliefs. A fortiori, there is no evidence that they attempted to *coerce* Harper into changing his beliefs. For all the above reasons, we hold that the district court did not abuse its discretion in finding that Harper failed to demonstrate a likelihood of success on the merits of his Establishment Clause claim.

**4.    Other Claims**

In addition to the denial of his preliminary injunction motion, Harper asks that we review the district court's dismissal of his due process and equal protection causes of action, as well as the court's grant of qualified immunity to the individual defendants, under the doctrine of "pendent appellate jurisdiction." We may exercise pendent appellate jurisdiction "over rulings that are inextricably intertwined with or necessary to ensure meaningful review of decisions that are properly before us on interlocutory appeal." *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 668 (9th Cir. 2004) (internal quotation marks omitted). In order for pendent issues to be "inextricably intertwined" they must either "'(a) be so intertwined that we must decide the pendent issue in order to review the claims properly raised on interlocutory appeal . . . or (b) resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue.'" *Batzel v. Smith*, 333 F.3d 1018, 1023 (9th Cir. 2003) (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1285 (9th Cir. 2000)).

With regard to Harper's due process cause of action, it is based on his claim that the School's dress code is impermissibly vague in violation of the Due Process Clause. As we have already explained, *see supra* note 11, we need not consider the validity of the School's dress code in order to rule on the preliminary injunction. As to Harper's equal protection contention, as presented on this appeal it is simply

a restatement of his viewpoint discrimination claim which, for the reasons already provided, we have rejected. Whether or not there may be other aspects to the claim we do not know with certainty at this point in the proceedings; thus we do not review that claim here. Accordingly, neither the due process nor equal protection claim is one we must decide in order to resolve the issue before us, and our resolution of the issue before us does not require us to determine the merits of either claim. Whatever the merits of those claims (and we have no cause here to question the district court's decision as to either), their validity or invalidity is of no consequence here. Finally, the district court's dismissal of Harper's damages claims based on a finding of qualified immunity is not "inextricably intertwined" with the denial of the preliminary injunction motion, *Poulos*, 379 F.3d at 668, as we need not "decide the [qualified immunity] issue in order to review the claims properly raised on interlocutory appeal . . . ." *Batzel*, 333 F.3d at 1023 (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1284 (9th Cir. 2000)).

## VI. Conclusion

We hold that the district court did not abuse its discretion in denying the preliminary injunction. Harper failed to demonstrate that he will likely prevail on the merits of his free speech, free exercise of religion, or establishment of religion claims. In fact, such future success on Harper's part is highly unlikely, given the

53

legal principles discussed in this opinion. The Free Speech Clause permits public schools to restrict student speech that intrudes upon the rights of other students. Injurious speech that may be so limited is not immune from regulation simply because it reflects the speaker's religious views. Accordingly, we affirm the district court's denial of Harper's motion for a preliminary injunction.

AFFIRMED; REMANDED for further proceedings consistent with this opinion.

**Exhibit A**



## COUNSEL

Robert H. Tyler, Kevin Theriot; Alliance Defense Fund, Murrieta, California, for the plaintiff-appellant.

Daniel Shinoff, Jack M. Sleeth, Jr., Paul V. Carelli, IV; Stutz, Artiano, Shinoff & Holtz, APC, San Diego, California, for the defendants-appellees.